JARVIS, KRIEGER & SULLIVAN
Adam M. Tamburelli, State Bar No. 301902
E-mail: adam@jarvislawyers.com
Eliot F. Krieger, State Bar No. 159647
E-Mail: eliot@jarvislawyers.com
Charles T. Spagnola, P.C., State Bar No, 144983
E-Mail: charles@jarvislawyers.com
444 West Ocean Boulevard, Suite 1700
Long Beach, CA 90802
Telephone: (562) 597-7070
Facsimile: (562) 597-7772

ZIMMERMAN LAW OFFICES, P.C.
Thomas A. Zimmerman, Jr. (*pro hac vice anticipated*)
E-mail: tom@attorneyzim.com
Matthew C. De Re (*pro hac vice anticipated*)
E-mail: *matt@attorneyzim.com*
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180

***Attorneys for Plaintiff Mario Aliano***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO ALIANO individually and, on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE, INC, a New York corporation; NFL ENTERPRISES, LLC, a Delaware limited liability company; DIRECTV HOLDINGS, LLC, a Delaware limited | Case No.:<br><br>**CLASSACTION**<br><br>**COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT, 15 U.S.C §§ 1-2** |

liability company; and DIRECTV, LLC, a **JURY TRIAL DEMANDED**
California limited liability company,

      Defendants

## CLASS ACTION COMPLAINT

Plaintiff Mario Aliano (hereafter "Plaintiff"), by and through his attorneys, brings this Class Action Complaint ("Complaint") for individual (non-commercial) purchasers of DirecTV and the NFL Sunday Ticket package, described hereafter as "subscribers," from defendants DirecTV, LLC and DirecTV Holdings, LLC (collectively, "DirecTV") and the National Football League, Inc. and NFL Enterprises, LLC (collectively, the "NFL") as described more fully below.

## INTRODUCTION

1.    This Complaint challenges an agreement between DirecTV and the NFL that protects and increases the profits earned by DirecTV and the NFL, on behalf of its 32 member teams, from the live broadcast of Sunday afternoon out-of-market NFL games. Out-of-market games means NFL games played on Sunday afternoon and not otherwise broadcast on networks within the viewer's television market. This definition also excludes games within the home territory of an NFL team that is not aired on another network due to that team's failure to sell all of the tickets to the game prior to the blackout deadline for that game.

NFL Sunday Ticket or Sunday Ticket is recognized as a distinct product from NFL games broadcast on other networks and is trademarked by the Defendants. All allegations herein are based on information and belief except for those relating to Plaintiff and his own actions.

2.     Due to its exclusive agreement with the NFL, DirecTV is the sole provider of the live game feeds for these games through DirecTV's NFL Sunday Ticket service. This deal allows DirecTV to charge exorbitant prices for NFL Sunday Ticket. Only DirecTV has every game available to consumers.

3.     NFL Sunday Ticket is an out-of-market sports package that carries all NFL games produced by Fox and CBS. A consumer can choose to watch any Sunday afternoon game rather than being restricted to the games being broadcast by local affiliates. Sunday Ticket appeals to fans with loyalties to teams located outside of that fan's current market.

4.     Due to the exclusive agreement between DirecTV and the NFL, the Defendants are able to control the availability of, and increase the prices for, the live out-of-market NFL Sunday afternoon games. Each NFL member team owns the initial rights to the broadcasts of its own games. However, the teams have granted the NFL the exclusive right to market those games outside each team's home territory. In place of the agreement between DirecTV and the NFL, teams

would have to compete with each other for market share for programming, which would lead to more competitive pricing for fans.

5.      DirecTV's ability to offer NFL Sunday Ticket as an exclusive package is essential for its business. The availability of NFL Sunday Ticket only through DirecTV forces customers to keep DirecTV's service for the entire season and beyond, even when there are no football games being played. Other television providers do not have access to the NFL games and are therefore at a competitive disadvantage. As a result, DirecTV can claim unreasonably high prices. Other providers would be able to compete with DirecTV on price and service if they had access to distribution of the NFL Sunday Ticket games.

6.      The NFL is the most popular sports league in the United States and football is the most popular sport. Because DirecTV and the NFL know that Plaintiff and the Class have no other option for viewing out-of-market Sunday games, DirecTV and the NFL have agreed to set exorbitant prices for the Sunday Ticket package that are substantially higher than a reasonable market would allow. Except for the exclusive agreement between DirecTV and the NFL, prices would be much lower as would the overall price of DirecTV programming packages that are required to be purchased together with Sunday Ticket.

        ///

7.     Of the four major professional sports leagues in the United States, the only one with an exclusive out-of-market broadcasting agreement is the NFL and DirecTV's Sunday Ticket. Major League Baseball ("MLB"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL") all distribute live out-of-market games through multiple television providers. As a result, DirecTV does not charge nearly as much for access to the other sports' out-of-market programming packages, which provide more games over an expanded time frame than the NFL package.

8.     DirecTV and the NFL recently discussed their joint objective of maximizing the unreasonably high prices charged to Plaintiff and the Class. Plaintiff and the Class, as fans, were targeted because they must purchase Sunday Ticket in order to have access to out-of-market games of their favorite teams.

9.     Plaintiff seeks to enjoin under the federal antitrust laws the ongoing unreasonable restraint of trade that Defendants have implemented through DirecTV's exclusive arrangement to broadcast all Sunday afternoon out-of-market games. Plaintiff also seeks to recover damages for the Class for unreasonably high prices that DirecTV has charged for NFL Sunday Ticket as a result of this unreasonable restraint of trade.

///

10.     This exclusive agreement between DirecTV and the NFL eliminates competition by preventing other media providers from distributing Sunday afternoon out-of-market NFL games. But for the agreement, other providers would be willing to compete for consumers of these games, which would reduce consumer costs and increase competition for viewership. Other providers have attempted to obtain these rights but were told by the NFL that those attempts would be rejected. Additionally, except for the agreement among NFL teams to sell a single package of out-of-market games via the NFL and DirecTV, those individual teams would have to compete against each other and that competition would subsequently decrease the broadcast prices for these games.

## JURISDICTION AND VENUE

11.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

12.     This court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims that arise under federal law, and under 28 U.S.C. § 1337 for federal antitrust claims in particular.

///

13.     Under 15 U.S.C. § 15(a) and 22, and 28 U.S.C. § 1391(b), (c), and (d), this District has venue over the action, as Defendants resided, transacted business, were found, and/or had agents in this District, and this District was the site of a substantial portion of the affected interstate trade and commerce discussed herein during the Class period.

## INTRADISTRICT ASSIGNMENT

14.     Intradistrict assignment to the Central District is appropriate. The practices at issue adversely affect subscribers who reside in that division.

## INTERSTATE TRADE AND COMMERCE

15.     Defendants' activities, as described herein, were within the flow of and had a substantial effect on, the interstate commerce of the United States, including in this District, as Defendants intended.

16.     Defendants distributed and sold the NFL Sunday Ticket package in an uninterrupted and continuous flow of interstate commerce among the United States. Defendants' anticompetitive scheme consequently inflicted a direct, substantial, and reasonably foreseeable effect on interstate commerce.

///

///

///

# PARTIES

## Plaintiff

17.    Plaintiff Mario Aliano is a resident of Illinois. During the Class period, Plaintiff subscribed to NFL Sunday Ticket, which was distributed and sold by Defendants.

## Defendants

18.    Defendant DirecTV Holdings, LLC is a Delaware Limited Liability Company and has its principal place of business at 2230 East Imperial Highway, El Segundo, California. It is the U.S. operating arm of DirecTV, Inc.

19.    DirecTV, LLC is a California Limited Liability Company that has its principal place of business at 2230 East Imperial Highway, El Segundo, California. DirecTV, LLC issues bills to its subscribers.

20.    Until 2015, the NFL was an unincorporated association of 32 American professional football teams in the United States. Each of the 32 NFL member teams, headquartered in various cities around the country, is separately owned and operated, acting in its own economic self-interest and competing in most respects with one another.

21.    In or about 2015, the NFL incorporated as the National Football League, Inc., and has its headquarters at 345 Park Avenue, 7th Floor, New York,

New York. On information and belief, NFL Enterprises, LLC was organized to hold the broadcast rights of the 32 NFL teams and license them to providers and other broadcasters, including DirecTV. NFL Enterprises, LLC is also located at 345 Park Avenue, 7th Floor, New York, New York.

22.    Through the NFL, the 32 teams do cooperate in some respects, including by setting game rules and a game schedule, dividing their member teams into geographic territories and assigning each team a home television market for broadcasting purposes. The teams have also agreed to allow the NFL to negotiate on their behalf television contracts with national broadcasters, including for the broadcast of each team's games outside its home market. These include the Sunday Ticket package sold solely by DirecTV.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Class") consisting of:

All DirecTV individual (non-commercial) subscribers who purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time beginning four years prior to the filing of this complaint and until the effects of the anticompetitive conduct described herein.

24.     The Class excludes Defendants, their present and former parents, subsidiaries, affiliates, and co-conspirators; and government entities.

25.     Plaintiff is unsure of the exact number of persons comprising the Class, but given that DirecTV has sold its Sunday Ticket package to individuals across the nation during the relevant period, believes that the number of Class members is in the thousands. The exact number and their identities are known to DirecTV.

26.     Due to the large Class size, joinder of all members is impracticable.

27.     Plaintiff's claim is typical of the claims of the Class in that Plaintiff subscribed to NFL Sunday Ticket with DirecTV. As alleged herein, all Class members were damaged by the identical wrongful conduct.

28.     There are questions of law and fact common to the Class, including:

a.      Whether Defendants have engaged in and are continuing to engage in a contract, combination, or conspiracy among themselves to fix, raise, or maintain prices of presentations of live Sunday NFL out-of-market games by eliminating competition among presenters of those games;

b.      Whether Defendants have engaged in or are continuing to engage in a contract, combination, or conspiracy among

themselves to fix, raise, or maintain prices of the NFL Sunday

Ticket package by preventing any competitor from offering a

competing package;

c.      The identities of the participants in the conspiracy;

d.      The duration of the conspiracy and the acts performed by

Defendants in furtherance of it;

e.      Whether the alleged conspiracy violated Section 1 of the

Sherman Act, 15 U.S.C. § 1;

f.      Whether the alleged conspiracy violated Section 2 of the

Sherman Act, 15 U.S.C. § 2;

g.      Whether the conduct of Defendants caused injury to Plaintiff

and other members of the Class; and

h.      The appropriate Class-wide measure of damages.

29.      Plaintiff and the Class were, during the Class period, individual

subscribers to DirecTV who also purchased NFL Sunday Ticket. Their claims are

typical of the claims of the Class, and the named Plaintiff will fairly and

adequately protect the interests of that Class.

30.      These common questions of law and fact predominate over any

questions affecting only individual Class members.

31.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of class action litigation.

32.     Injunctive relief is appropriate in that Defendants have acted on grounds generally applicable to the Class as a whole.

33.     A class action is superior to the other available means of fair and efficient adjudication of the claims of Plaintiff and the members of the Class. The injury suffered by each individual member of the Class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' misconduct. It would be virtually impossible for individual members of the Class to redress effectively the wrongs done to them. Even if members of the Class could afford such individualized litigation, the court system could not. Individual litigation would pose a high risk of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties, and to the court system, due to the complex legal and factual issues presented by this dispute. By contrast, the class action method presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. This action presents no difficulties in management that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

34.     The relevant geographic market is the United States. The relevant product market is NFL Sunday afternoon out-of-market games. As described above, the national broadcast rights to select packages of games are negotiated by the NFL with various networks. In addition to broadcasts of these games, the market includes broadcast rights for out-of-market games, such as those carried in the NFL Sunday Ticket package. Broadcasts of other sports or other content do not compete with broadcasts of NFL games. Additionally, NFL games broadcast locally on Sunday afternoons are not interchangeable with the multi-game offering provided by Sunday Ticket specifically because the local games are different from the multi-game offering provided by Sunday Ticket, which appeals to fans who are located outside the geographical confines of their favorite teams' home markets.

35.     DirecTV distinguishes between residential and commercial subscribers. Individual residential subscribers and commercial businesses are treated as distinct markets.

36.     Although there is some substitution that might occur between in-market broadcasts (broadcasts of games that include the local NFL team) and out-of-market broadcasts, the availability of the in-market games does not compete away a monopolist's ability to raise the price of out-of-market games above competitive levels.

37.    New entries that would dilute the market power over NFL video broadcasts created by the collusive agreements described herein are extremely unlikely.

38.    New entries would require the creation of a new professional league playing American football. Such an undertaking would be enormously expensive, and very unlikely to succeed. Even if a new entrant did appear, and even if it were sufficiently successful to sustain itself, it is unlikely that the resulting video product would compete sufficiently with the NFL's broadcasts to dissipate the NFL's monopoly power.

39.    NFL teams are well established and popular, with 32 regionally diverse teams in or near almost every major population center in the United States. There are NFL teams within 18 of the 25 most populous metropolitan areas, dramatically limiting the locations and audiences available to new teams or leagues. During the NFL's history, not one of the few attempted entries has been successful at competing for NFL football broadcast audiences. It is virtually impossible that a new league will form to compete away the NFL's monopoly power.

40.    That monopoly power will only be diluted if the underlying collusive agreement that created the monopoly power is broken up through antitrust authority, or if the exclusive arrangement that propagates that monopoly power is

replaced by non-exclusive licenses.

41.     As noted above, the NFL's 32 member teams have given the league authority to negotiate pooled rights television deals on their behalf, in exchange for an equal share of the resulting revenues. The broadcast agreements with various networks were the result. In addition, the NFL Network, a cable and satellite network owned by the NFL, nationally broadcasts approximately eight regular season games.

42.     Pursuant to their respective agreements with the NFL, these entities televise between ten and fifteen weekly Sunday afternoon games. For the first 16 weeks of the 17 week NFL season, on an alternating basis, one network is designated to broadcast "doubleheader" games in both time slots and the other is designated to air a single game in one of the time slots. Both networks are permitted to show doubleheaders the last week of the season. Subject to certain restrictions for games that do not sell out, the broadcasters' local affiliate generally must broadcast any Sunday afternoon game being played by a team whose market falls within the local affiliate's coverage area.

43.     As a result of this arrangement, during most weeks of the season only three of the Sunday afternoon games are broadcast by providers and the specific games available to any given viewer depend on whether the viewer is located

within a team's home market and whether that team is playing on Sunday afternoon.

44.     Since 1994, pursuant to an exclusive agreement with the NFL, DirecTV began to offer its subscribers access to Sunday afternoon games that are not otherwise available in their market via national broadcasts. These subscribers could purchase NFL Sunday Ticket, a premium subscription-based package that provides access to all Sunday afternoon games broadcast on networks, or their predecessors.

45.     Through its exclusive agreement with the NFL, DirecTV takes the live game telecast feeds produced by the networks and redistributes them without alteration to NFL Sunday Ticket subscribers via DirecTV channels. NFL Sunday Ticket subscribers can access all network games, except for the in-market games broadcast by the local affiliates.

46.     Defendants have colluded to sell the out-of-market NFL Sunday afternoon games solely through DirecTV. This arrangement eliminates competition in the distribution of out-of-market Sunday afternoon games. It requires anyone wishing to view these games to subscribe to DirecTV and purchase the NFL Sunday Ticket package at the unreasonably high price charged by DirecTV.

///

47.     DirecTV's exclusive agreement with the NFL results in NFL Sunday Ticket subscribers, including the Plaintiff, paying a higher price for NFL Sunday Ticket than they would otherwise pay if the agreements were competitively negotiated.

48.     The agreement between the NFL and DirecTV granting DirecTV the exclusive right to distribute Sunday afternoon out-of-market games is unnecessary to ensure telecast of such NFL games. Broadcasters are contractually obligated to produce these games and provide the broadcast of them in local markets.

49.     The exclusive deal between DirecTV and the NFL for the broadcast rights of NFL Sunday Ticket is necessary to preserve the exercise of market power created by the teams' anticompetitive arrangement to monopolize the sales of broadcast rights. Without this exclusive deal, some of the monopoly power created by the collusion among NFL teams would be diluted by competition between DirecTV and one or more distributors of broadcasts to the public.

50.     There is no evidence to show that the agreement was created to ensure a quality broadcast of the games offered on Sunday Ticker or to allow the NFL sufficient oversight of games offered or any other reasonable objective. Rather it seems that the agreement was created to artificially raise the price of the Sunday Ticket package.

51.     The out-of-market Sunday afternoon games constitute a distinct product market and are not interchangeable with the telecasts of local NFL games. In contrast to the NFL's exclusive deal with DirecTV, the NBA, the NHL, and MLB offer their live out-of-market games through both DirecTV and other cable sports networks. These other networks would compete for viewers of Sunday afternoon out-of-market NFL games, resulting in lower prices as teams and providers competed for viewers. Defendants could achieve any legitimate pro-competitive goals without an exclusive agreement.

52.     Defendants and their co-conspirators' exclusive agreement has a clear negative impact on competition. There is no evidence that this agreement was created to ensure the quality of Sunday Ticket or to allow the NFL sufficient oversight, or any other reasonable objective. Instead, DirecTV and the NFL entered into this agreement with the intent of maintaining a monopoly price for Sunday Ticket. Additionally, because all the NFL teams have colluded to offer the package, they have also prevented individual competition by teams selling their own games to broadcasters.

53.     There are several more competitive alternatives which would achieve any legitimate goals. These include letting teams contract individually with DirecTV and allowing other distributors to purchase and distribute the NFL

Sunday Ticket package.

54.     Plaintiff seeks to restore competition by ending the anti-competitive agreement by Defendants that eliminate competition in the distribution of the live out-of-market NFL games, while monopolizing or attempting to monopolize the broadcast market for out-of-market Sunday afternoon NFL games.

55.     Plaintiff and the Class have suffered antitrust injury. Plaintiff and the Class were, and continue to be, harmed by Defendants' anti-competitive agreement. Plaintiff and the Class are individual subscribers of NFL Sunday Ticket, and the restrictions enforced by the exclusive agreement between DirecTV and the NFL forces Plaintiff and the Class to pay a higher unreasonable price for the package than they otherwise would have paid if the agreement was competitively negotiated.

56.     The agreements described above have restrained competition between and among the distributors of NFL games, including competition in the commercial exploitation of televised presentations of live games. Without this particular agreement between DirecTV and the NFL, there would be much greater competition for the distribution of NFL games than the limited competition currently available.

57.     The agreements described above have adversely affected and substantially hindered competition. As a result, prices are higher than they

otherwise would be in the absence of these agreements.

58.     There are no legitimate competitive reasons for this exclusive agreement and other restraints which would justify the anti-competitive harm they create.

**COUNT ONE**
**Violation of Section 1 of the Sherman Act**
(***Per Se* Violation**)

59.     Plaintiff, on behalf of himself and the Class, incorporates and realleges paragraphs 1-58 of the Complaint.

60.     Beginning at an unknown time and continuing through the present, Defendants, including the 32 teams of the NFL, entered into a continuing agreement, combination, or conspiracy in restraint of trade with the purpose, intent, and effect of limiting competition in the live game distribution market with the purpose, intent, and effect of restraining trade and commerce in the distribution of live NFL games, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

61.     The contract, combination or conspiracy alleged herein, including agreements between the 32 NFL teams, aims to limit competition between and among the teams, who would otherwise be competitors in the distribution of live games. Application of the per se rule is justified due to the facts and circumstances stated herein.

///

62.     This contract, combination or conspiracy has restrained competition between and among DirecTV and potential competitors in violation of Section 1 of the Sherman Act. It has led to a decrease in competition, including increased pricing and reduced options and has otherwise caused injury to consumers and competition in those relevant markets.

63.     The Defendants' contract, combination, agreement, or understanding occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual agreements, contracts, or understandings by, between and among the Defendants.

64.     Defendants' unlawful conduct has hindered competition and directly and proximately caused antitrust injury, in the form of higher prices and reduced options as outlined above. Plaintiff and other individual subscribers will continue to suffer antitrust injury and other damages unless Defendants are enjoined from continuing to engage in the above-mentioned violations of law.

## COUNT TWO
### Violation of Section 1 of the Sherman Act
### (Rule of Reason)

65.     Plaintiff, on behalf of himself and the Class, incorporates and realleges paragraphs 1-58 of the Complaint.

66.     Beginning at an unknown time and continuing through the present, Defendants, including the 32 teams of the NFL, entered into a continuing

agreement, combination, or conspiracy in restraint of trade with the purpose, intent, and effect of limiting competition in the live game distribution market with the purpose, intent, and effect of restraining trade and commerce in the distribution of live NFL games, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

67.     This agreement, combination, or conspiracy has resulted in an agreement or understanding between and among Defendants that Sunday Ticket will be exclusively provided by DirecTV. This agreement forbids any other competitor from offering Sunday Ticket package.

68.     This agreement, combination or conspiracy has restrained competition between and among DirecTV and potential competitors in violation of Section 1 of the Sherman Act. It has led to a decrease in competition, including increased pricing and reduced options and has otherwise caused injury to consumers and competition in those relevant markets.

69.     The relevant geographic market is the United States. The relevant product market is the market for distribution of NFL games through the Sunday Ticket package to individual subscribers. The Defendants recognize this product market and direct advertising and marketing resources towards this market and to individual subscribers specifically.

        ///

70.     The NFL, and its 32 member teams, has monopoly power in regards to the creation, licensing and distribution of NFL games. DirecTV has significant power in the broadcast provider market and specifically in the market for individual subscribers. DirecTV's exclusive agreement with the NFL for the distribution of Sunday Ticket enhances DirecTV's market power and provides it with a monopoly in the market for the distribution of Sunday NFL games via the NFL Sunday Ticket package.

71.     The Defendants' agreement occurred in or affected interstate commerce. Defendants' unlawful conduct was through mutual understandings, agreements, or concerted efforts by, between, and among Defendants.

72.     Defendants' unlawful conduct has restricted competition and directly and proximately caused antitrust injury in the form of higher pricing and reduced options, as stated above. Plaintiff and other individual subscribers will continue to suffer antitrust injury and other damages unless Defendants are enjoined from continuing to engage in the above-mentioned violations of law.

## COUNT THREE
### Violation of Section 2 of the Sherman Act

73.     Plaintiff, on behalf of himself and the Class, incorporates and realleges paragraphs 1-58 of the Complaint.

///

74.     Defendants, through the above-mentioned unlawful conduct, possess a monopoly over the creation and distribution of NFL football broadcasts. Defendants have used that power to unreasonably exclude and/or limit competition, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), by limiting the distribution of Sunday Ticket to only DirecTV. These actions are beyond what would be considered reasonable activities and are an abuse of Defendants' power in the market.

75.     The relevant geographic market is the United States. The relevant product market is the market for distribution of NFL games through the Sunday Ticket package to individual subscribers. The Defendants recognize this product market and direct advertising and marketing resources towards this market and to individual subscribers specifically.

76.     Through the misconduct alleged herein, DirecTV has knowingly acquired and maintained monopoly power and, unless reined in by the Court, will continue to willfully maintain that power in the market through unreasonable and anti-competitive conduct. The NFL, and its 32 member teams, have acted with intent to allow DirecTV to unlawfully acquire and maintain that monopoly power in the market. Defendants' misconduct has allowed DirecTV to obtain said power in violation of Section 2 of the Sherman Act.

77.     Defendants' unlawful conduct has restricted competition and directly and proximately caused antitrust injury in the form of higher pricing and reduced options, as stated above. Plaintiff and other individual subscribers will continue to suffer antitrust injury and other damages unless Defendants are enjoined from continuing to engage in the above-mentioned violations of law.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, and for the foregoing reasons, Plaintiff prays this Court enter judgment on his behalf and on behalf of the Class herein, adjudging and decreeing that:

a.     This action may proceed as a class action pursuant to Fed. R. Civ. Pro. Rules 23(b)(2) and (b)(3), with Plaintiff designated as the Class representative, as described above, and his counsel designated as Class Counsel;

b.     That the contract, combination, or conspiracy, and the acts committed in relation thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act (15 U.S.C. § 1);

///

c.    That Defendants' actions to unlawfully attain and maintain monopoly power be adjudged to have violated Section 2 of the Sherman Act (15 U.S.C. § 2);

d.    That judgment be entered for Plaintiff and the Class members on claim for damages, pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26);

e.    That Plaintiff and members of the Class recover pre-judgment and post-judgment interest as permitted by law;

f.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined from maintaining the competition, conspiracy, or agreement described herein;

g.    That Plaintiff and members of the Class recover their costs of the suit, including attorneys' fees and expert fees, as provided by law; and

h.    Such other and further relief as this Court deems just and proper under the circumstances.

Dated: July 21, 2015        **JARVIS KRIEGER & SULLIVAN, LLP**

By:   s/Adam M. Tamburelli
Adam M. Tamburelli (SBN: 301902)


**ZIMMERMAN LAW OFFICES, P.C.**

By:   s/Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr.
(*pro hac vice anticipated*)
Matthew C. De Re
 (*pro hac vice anticipated*)

Attorneys for Plaintiff MARIO ALIANO, individually, and on behalf of all others similarly situated.

27
COMPLAINT